IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ESTATE OF COLTON PETERSON, JULIENA DARLING, and WILLIAM DARLING,<br><br>        Plaintiffs,<br><br>vs.<br><br>CITY OF MISSOULA, MISSOULA CITY POLICE DEPARTMENT, COUNTY OF MISSOULA, MISSOULA COUNTY SHERIFF'S DEPARTMENT, MISSOULA CITY POLICE CHIEF MARK MUIR, MISSOULA POLICE DETECTIVE DAVID KRUEGER, MISSOULA COUNTY SHERIFF MIKE McMEEKIN, and DOES 1-25,<br><br>        Defendants. | CV 12–123–M–DLC<br><br>ORDER<br><br>**FILED**<br><br>AUG 0 6 2014<br><br>Clerk, U.S District Court<br>District Of Montana<br>Missoula |

Twenty-one year old Colton Peterson was arrested for growing and selling marijuana. Police were informed by multiple sources that Colton was possibly suicidal and in need of a mental evaluation. Nevertheless, Defendant Detective David Krueger pressured Colton to supply names and information about bigger drug dealers, including information on how to set up controlled buys or sells. Less than two hours after a final meeting with police, where Colton was given an

1

ultimatum to provide three names of drug dealers or else face a lengthy prison sentence, Colton committed suicide. The Estate of Colton Peterson and his parents have sued the police officers involved in the investigation, the police department heads, the city, and the county under 42 U.S.C. § 1983, and various state law theories. United States Magistrate Judge Keith Strong recommended dismissal of all of Plaintiffs' claims, and Plaintiffs timely objected. Though this case presents several close questions, this Court disagrees with certain of Judge Strong's findings and recommendations and therefore rejects them in part and adopts them in part.

**BACKGROUND**

**I.     Facts**

On Defendants' motion for summary judgment, all facts must be construed in the light most favorable to Plaintiffs and all reasonable inferences drawn in Plaintiffs' favor. *Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014).

In the early morning hours of July 24, 2010, Missoula Police Officer Patrick Mulligan responded to a 911 call regarding an incident at the apartment of Plaintiff decedent, twenty-one year old Colton Peterson ("Colton"). Colton was observed with visible injuries to his face and head. Colton told Officer Mulligan and other officers on the scene that he had received a phone call from an

2

acquaintance, Daniel Parmiter, who told Colton that he was coming to Colton's house to shoot him with a shotgun. According to Colton, ten minutes later, Parmiter and two other young men arrived at Colton's apartment. Colton answered his door armed with his 9 mm pistol. Colton pointed the gun at the men. He pulled the trigger, but nothing happened. The men attacked Colton. The men attempted to take the gun from Colton. They kicked Colton in the head repeatedly. A neighbor heard the disturbance and called 911. The men fled. Colton chased after them firing his empty pistol. Colton relayed this same information to Missoula Police Officer Chris O'Leary the following day.

When police arrived at Colton's apartment on July 23rd, Colton was upset and yelling about the incident. Colton repeatedly told the officers that he was going to kill Parmiter and the other men, and then kill himself. A friend of Colton's, Ryan Courson, was also present. Courson told the responding officers that Colton had recently been talking about suicide. Colton's brother, Dustin Peterson, was also present. In the context of Colton's statements about killing his assailants and himself, Dustin told officers at the scene that he was concerned about Colton having a gun.

After the officers left, Courson snuck into Colton's apartment and took Colton's 9 mm handgun. Courson gave the gun to Colton's mother, Plaintiff

Juliena Darling and Colton's stepfather, Plaintiff William Darling. Courson took the gun because he was concerned that Colton was going to kill someone or himself.

Around 7:00 on the morning of July 24, 2010, Colton called Missoula police to report that his parents had stolen his gun. Officer O'Leary responded to the report by calling Colton's mother, Juliena. Juliena told Officer O'Leary that she and her husband had taken the gun because Colton had threatened to kill his assailants and then himself, and that she wanted Colton to receive professional mental health treatment before giving the gun back to him. Juliena further told O'Leary that she believed Colton was suicidal. Officer O'Leary gave Juliena information to contact the county attorney's office for assistance on how to get a mental health evaluation for Colton. Officer O'Leary reported that Colton's parents were "extremely concerned regarding Colton's mental health and believed removing the pistol from him was necessary." (Doc. 102-1 at 6.)

Officer Sean Kosena followed up on the July 23rd incident by telephoning Colton at around 10:00 a.m. on July 25, 2010. Officer Kosena had learned about Colton from Officer O'Leary. Colton told Officer Kosena that he had intended to kill Parmiter and the others when they had arrived at his door on July 23rd. Colton told Officer Kosena about threatening phone calls he had received. Officer

4

Kosena noted that Colton was "extremely upset." *Id.* Colton told officer Kosena

that he would take matters into his own hands.

Officer Kosena then circulated a memo via email to three Missoula Police

Department detective supervisors, with the subject line "Colton Peterson." (Doc.

102-6 at 2.) The email described the July 23rd incident, including the details

regarding Colton's attempt to shoot his assailants and the beating he subsequently

suffered at their hands. The email also relayed the fact that Colton's parents had

taken his gun from him after he had threatened to kill the assailants and himself.

The email noted that Colton's parents "are extremely concerned regarding

Colton's mental health and believed removing the gun was necessary." *Id.* The

email further noted that Colton was "extremely upset" and that he "[d]efinitely

[presented] a two person 10-19 situation," which means that officers should meet

with Colton at the police station with another officer present. *Id.*

Officer Katherine Petersen was assigned to Colton's case on July 26, 2010.

Officer Petersen received Officer Kosena's memo on the morning of July 26th.

Officer Petersen called Colton to inquire about the July 23rd incident. Colton told

Officer Petersen that he had fired the gun at Parmiter and the others. He told her

that he had simply forgotten to put a bullet in the chamber. Colton told Petersen

that his parents had taken his gun because they were afraid he was going to kill

himself. Officer Petersen asked Colton why he would kill himself. Colton

responded, "Why not?". (Doc. 102-1 at 8.) Officer Petersen reported that Colton

became "agitated" with her throughout the conversation. *Id.* at 9.

Officer Petersen then called Colton's neighbor, Sage Burgess, who had

called 911 on the night of the July 23rd incident. Burgess told Officer Petersen

that the day prior to the July 23rd incident she had heard Colton yelling about

someone slashing his tires. Burgess also told Officer Petersen that she had heard

Colton yelling that he was going to kill himself.

At the time, Defendant Detective David Krueger was employed by the

Missoula Police Department and working for the Missoula High Intensity Drug

Trafficking Area drug task force. His supervisor was Lieutenant Brester.

Lieutenant Brester was also Detective Petersen's supervisor, and Lieutenant

Brester sent the Kosena email to Detective Petersen.

Officer Petersen called Detective Krueger on July 26, 2010. Officer

Petersen told Detective Krueger about the memo from Kosena, though not in

detail, and about the July 23rd incident and the fact that Colton had waved a gun

around and attempted to shoot one of his assailants. Officer Petersen also told

Detective Krueger that, according to her informant, it was "common knowledge"

that Colton was growing marijuana inside his apartment. (Doc. 94-4 at 6.) Officer

Petersen and Detective Krueger spoke on the telephone six times on July 26, 2010. Detective Petersen claims not to remember the substance of their conversations.

Detective Krueger, with the assistance of Detective Jon Gunter, obtained further information from other informants that Colton was growing marijuana in his apartment. Detective Krueger applied for a search warrant to search Colton's apartment. A search warrant was issued.

Colton was tipped off by a friend that the police were coming to arrest him for growing marijuana. He attempted to destroy evidence. He gathered his cut marijuana product, put it in his truck, and began driving. He was followed by law enforcement. He abandoned his vehicle, which was then impounded and several jars of marijuana were found inside.

Detectives Krueger and Gunter executed the search warrant for Colton's apartment, where they found numerous marijuana plants. While the search was ongoing, Colton called 911 to turn himself in. He was taken by police to his apartment. Detective Krueger spoke with Colton inside the apartment. Detective Krueger told Colton that he seemed like a good kid who had made some bad decisions, but that the County Attorney, who would review Detective Krueger's report, would not know what kind of person Colton truly was unless Colton talked to him. Colton asked if he was going to be arrested. Detective Krueger told him

that he didn't know if Colton was going to be arrested, and said that "a lotta that is gonna depend on how forthcoming you are." (Doc. 93-13 at 3.)

Colton's mother, Juliena, arrived at the apartment while Detective Krueger was talking to Colton. Juliena spoke with Detective Gunter. She told Detective Gunter that she would not bail Colton out of jail because she was concerned about his mental health. She told Detective Gunter that she and her husband thought Colton was suicidal. She told Detective Gunter that Colton had recently given away some of his belongings. She told Detective Gunter that she and her husband had attempted unsuccessfully to get Colton a mental health evaluation. Juliena asserted that Colton needed a mental health evaluation. Detective Gunter said that he and Detective Krueger would get Colton a mental health evaluation.

Soon after this exchange between Detective Gunter and Juliena, Detective Krueger came outside and told Detective Gunter that Colton was being "cooperative." (Doc. 94-2 at 5.) The following exchange between the two detectives then took place:

Q:     [Gunter] That's fine and then you need to ask him this, you need to ask him if he's feelin' suicidal, or anything else, cause I mean, I don't care if this kid goes to jail tonight or not–

Q:     [Krueger] Right, right–

8

Q:      [Gunter] I mean seriously, um, but if he is feelin' suicidal, or

         somethin' else is goin' on, if people are after him, I mean–

Q       [Krueger] Uh huh–

Q:      [Gunter] Then let's go get him a mental eval and, and –

Q:      [Krueger] Right–

Q:      [Gunter] See where we're at on that–

Q:      [Krueger] Right, so, hey what do you wanna do with this stuff before

         we do that?

(Doc. 93-13 at 14-15.)

Detective Krueger then returned inside Colton's apartment. He did not ask any questions at that time about Colton's mental state or whether Colton was feeling suicidal. After further questioning, Colton confessed that he had been growing and selling marijuana illegally.

Detective Krueger then drove Colton to the towing garage where Colton's vehicle was impounded. At the towing garage, another law enforcement officer asked Detective Krueger if Colton was going to go to jail. Detective Krueger told the officer that he didn't know. The officer was surprised. The officer asked if Colton was going to "walk." (Doc. 93-13 at 30.) Detective Krueger responded by saying that Colton was "bein' real cooperative." *Id.*

9

Detective Krueger obtained consent to search Colton's vehicle. The officers seized more marijuana and other evidence from Colton's vehicle.

Detective Krueger then drove Colton to the police station to conduct an additional interview. Colton again confessed to illegally growing and selling marijuana. Detective Krueger told Colton that he knew Colton was "in the game," but that he didn't care about "the guy who sells a little bit of weed." *Id.* at 50. Krueger told Colton that he only cared about the "top guys" who sell lots of drugs. *Id.* at 51. Detective Krueger told Colton that when people cooperate and give out names, and are "able to make things work," then Detective Krueger would inform the prosecutor about the cooperation and suggest to the prosecutor that the person be given a break. *Id.* at 51. Detective Krueger asked Colton what he knew about other drug dealers. Colton said that he honestly didn't know anyone, but that if he did know someone he would tell Detective Krueger.

Detective Krueger said that if Colton wanted him to say anything helpful for Colton to the prosecutor, then Colton needed to give him names or information immediately. Colton then gave Detective Krueger the name of a person who Colton said dealt cocaine. Detective Krueger pressed Colton for details. Colton provided more details. Detective Krueger pressed Colton for more information about people dealing drugs. Colton gave another name.

10

Detective Krueger then asked Colton how he was feeling. He asked if Colton was having suicidal thoughts. Colton responded that he was really disappointed in himself. Detective Krueger said that he could find a mental health professional for Colton to speak with if he wanted. Colton declined. Detective Krueger then shut off the recorder and left the room.

Detective Krueger then telephoned Colton's mother. Detective Krueger told Juliena that Colton was going to be released to her custody, and that she should come pick Colton up. Juliena got very upset and said that she was not going to come pick Colton up. Juliena and Detective Krueger then "got into a pretty big argument." (Doc. 102-10 at 4.) Juliena expressed her concern that Colton was suicidal. She relayed to Detective Krueger everything that she had told Detective Gunter. Juliena told Detective Krueger that he needed to arrest Colton and get him a mental evaluation. She told Detective Krueger that Detective Gunter and Officer O'Leary had indicated that Colton would get a mental evaluation. Juliena "begged" Detective Krueger to help her, because Colton was talking about killing himself. *Id.* She repeatedly told Detective Krueger that Colton had been talking about killing himself and that she was concerned for Colton's safety. She told Detective Krueger that it was ridiculous for him to believe that Colton was not suicidal simply because Colton had not admitted to Detective Krueger that he was

11

suicidal. Detective Krueger said that he would not get Colton a mental evaluation. Juliena accused Detective Krueger of wanting to use Colton. Juliena asked if Colton would have to obey her since Colton was being released to her custody. Detective Krueger said that Colton would not have to obey her. Juliena got very upset. Detective Krueger said the conversation was over and hung up.

Detective Krueger then returned to the interview room with Colton. He asked no further questions about Colton's mental health or suicidal thoughts. Detective Krueger told Colton that Colton was looking at a lot of charges, but that Colton was not going to be put in jail that night. He told Colton that he would write in his report that Colton was cooperative. He said that he would personally talk to the County Prosecutor about how forthcoming Colton had been.

Detective Krueger then told Colton that it was really important that Colton go home that night and think about the names of additional big drug dealers that he could supply. He asked Colton to "[s]pecifically think of any way that we can get in to [the big dealers], you know what I mean, get in to them, right, . . . [i]f we can buy from them, if we can sell them something, if we can do that, okay, you're a smart guy." (Doc. 93-13 at 65.) Detective Krueger told Colton to "keep [his] mouth shut." *Id.* He told Colton not to talk to any of his friends. He told Colton to pretend like he had outsmarted the cops, and keep everything "on the down

low." *Id.* at 66. Detective Krueger told Colton to call him with the information about other dealers by 5:00 p.m. the next day. Detective Krueger told Colton that he was getting a good second chance, and advised Colton to use it.

Juliena and Bill Darling picked Colton up from the police station. Juliena testified that she never spoke with Detective Krueger at the police station that night. Detective Krueger, however, later reported to his supervisor that he spoke with Juliena that night and asked her to take Colton to a hospital for a mental evaluation.

Colton returned to his apartment. Colton's friend, Shanen Johns, met him there. According to Ms. Johns, Colton was "very panicked" and "all over the place" that night. (Doc. 114-3 at 5.) Colton told Ms. Johns that he "had to give names or he was going to jail." *Id.* Ms. Johns tried to calm Colton down, and decided to stay the night with him because Colton "clearly didn't need to be left alone." *Id.* at 6.

The next day, July 27, 2010, Detective Krueger contacted Colton. Detective Krueger told Colton to meet him at the Willard School parking lot. Colton drove to the Willard School at approximately 1:20 p.m. Ms. Johns accompanied him. Detective Krueger was waiting at the Willard School parking lot in an unmarked police car. Detective Krueger exited his vehicle. Colton exited his vehicle and

walked over to meet with Detective Krueger. Ms. Johns tried to listen to the conversation between Colton and Detective Krueger, but could not hear exactly what they were saying. She observed that Colton "began getting upset and continually raised his hands up, shrugging his shoulders in frustration." (Doc. 102 at 22.) Detective Krueger raised his voice with Colton. After ten minutes, another police officer arrived. He walked over and Colton became visibly scared. Detective Krueger and the other officer stood on either side of Colton and continued to talk to him. Colton soon began crying and was visibly upset.

Eventually, Colton was allowed to returned to his vehicle. Colton's "demeanor [had] changed dramatically" when he returned to the vehicle. *Id.* He was "frantic." *Id.* He started crying, and was "extremely upset." *Id.* He told Ms. Johns that he had to give the police three more names or he "would be gone forever and would never see [Ms. Johns] or his family again." *Id.*

Detective Krueger did not record the interaction at Willard School. During his deposition, Detective Krueger testified that the meeting at Willard School generally went well, and ended with Colton shaking Detective Krueger's hand, and thanking Detective Krueger. However, Detective Krueger's supervisor, Lieutenant Brester, testified that Detective Krueger told him that the meeting at Willard School "basically . . . didn't go very well." (Doc. 102-18 at 4.) Lieutenant

14

Brester further testified that Detective Krueger told him that at Willard School the "idea of [Colton and Detective Krueger] working together or working a drug case . . . had kind of fallen apart and Colton was upset." *Id.*

Less than two hours after the meeting with Detective Krueger at the Willard School, Colton committed suicide. He shot himself in the head with a rifle.

## II.    Procedural Posture

The Estate of Colton Petersen, Juliena Darling, and William Darling sued Defendants City of Missoula, Missoula City Police Department, County of Missoula, Missoula County Sheriff's Department, Missoula City Police Chief Mark Muir, Missoula Police Detective David Krueger, Missoula County Sheriff Mike McMeekin, and Missoula County Sheriff's Detective Jon Gunter asserting claims pursuant to 42 U.S.C. § 1983, as well as state law claims for wrongful death, negligence, and emotional distress, and violations of the Montana Constitution.[1]  Pursuant to 18 U.S.C. § 636(b)(1), the case was referred to Magistrate Judge Strong for pretrial proceedings and findings and recommendations on all motions excepted from the magistrate's jurisdiction.

All Defendants move for summary judgment on all claims. Judge Strong issued findings and recommendations on March 25, 2014, recommending all of

_____

[1]  Detective Gunter has since been voluntarily dismissed.

15

Plaintiffs' claims be dismissed. Because Judge Strong found Detective Krueger was not liable, he concluded that all of Plaintiffs other claims based on supervisory liability under the theory of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), must also be dismissed. Judge Strong made no specific findings regarding Plaintiffs' *Monell* claims or individual supervisory liability claims.

Plaintiffs concede that their *Monell* claims and supervisory liability claims are dependent on a finding of liability for Detective Krueger. Plaintiffs specifically object to Judge Strong's findings and recommendations with respect to Detective Krueger's liability, and generally object to the follow-on conclusion that all *Monell* and supervisory liability claims must be dismissed. Plaintiffs are therefore entitled to *de novo* review of the specified findings or recommendations to which they object. 28 U.S.C. § 636(b)(1). The portions of the findings and recommendations not specifically objected to will be reviewed for clear error. *McDonnell Douglas Corp. v. Commodore Bus. Mach., Inc.,* 656 F.2d 1309, 1313 (9th Cir. 1981). In addition, because Judge Strong tiered his analysis to his finding regarding Detective Krueger, and because the Court rejects in part this portion of Judge Strong's findings and recommendations, the Court will rule on Defendants' motions for summary judgment that were not specifically addressed

by Judge Strong.

**SUMMARY JUDGMENT STANDARD**

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248. In ruling on a motion for summary judgment, a court must view the evidence "in the light most favorable to the opposing part." *Tolan,* 134 S.Ct. at 1866 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 1863 (quoting *Anderson*, 477 U.S. at 255.)

**OBJECTIONS**

## I. Factual Objections

Plaintiffs object to the following four factual findings set forth in the findings and recommendations: Colton was not taken into custody; no facts prove that any law enforcement officers knew Colton was considering taking his own

17

life; no facts show that any law enforcement officers were aware of facts that put them on notice that Colton intended to take his own life; and no defendants exposed Colton to a new risk of harm or made him dependent upon the law enforcement officers for his safety.

Local Rule 72.3(a)(1) requires that objections filed pursuant to 28 U.S.C. § 636(b)(1) must itemize "each factual finding of the Magistrate Judge to which objection is made, identifying the evidence in the record the party relies on to contradict that finding."

### A. Custody

Judge Strong's findings and recommendations state that "[Colton] was not taken into custody." (Doc. 189 at 4.) Plaintiffs object that Detective Krueger admitted to taking Peterson into custody on July 26, 2010, following the execution of the search warrant of Peterson's apartment and cite to Defendant Krueger's statement of undisputed facts.

Plaintiffs do not contend that Colton was again taken into custody on July 27th at the Willard School. Nor do Plaintiffs contend that Colton was in custody at the time he committed suicide. Plaintiffs' factual objection thus appears to lack any materiality. Nonetheless, the Court agrees with Plaintiffs that Colton was in fact taken into custody on July 26, 2010, and therefore sustains the factual

18

objection.

### B. Officer Knowledge

Judge Strong found that "[t]here are no admissible facts (as opposed to speculation) proffered . . . that any of the law enforcement officers knew that [Colton] was considering taking his own life." *Id.* Plaintiffs object that the following officers had specific knowledge that Colton was considering suicide: Officer Patrick Mulligan, Officer Chris O'Leary, Sgt. Sandy Kosena, Missoula Police Detective Katherine Petersen, Missoula Police Detective Krueger, and Sheriff's Detective Jon Gunter. The Court will discuss the evidence as it pertains to each officer's knowledge in turn. Ultimately, however, the evidence relative to Detective Krueger's knowledge is all that matters for resolving the specific question of whether summary judgment in favor of Detective Krueger is appropriate. The knowledge of all other officers is generally only relevant to the question of whether summary judgment is appropriate on Plaintiffs' *Monell* liability claims.

Officer Mulligan is the Missoula City Police Officer who first responded to Colton's residence regarding the July 23rd incident in which Colton was assaulted by men who broke into his apartment. According to deposition testimony, Mulligan spoke with Colton, Colton's brother Dustin Peterson, and Colton's

friend Ryan Courson that evening. In Officer Mulligan's presence, Colton was yelling that he was going to kill his assailants and then kill himself. In addition, Courson told Mulligan that Colton had recently been talking about suicide. Viewing the evidence in the light most favorable to Plaintiffs, it is reasonable to infer that Officer Mulligan knew that Colton was potentially suicidal.

Officer O'Leary followed up on the July 23rd incident and Colton's report that his gun had been stolen by his parents. Officer O'Leary learned that the gun had been confiscated by Colton's parents because Colton had threatened to kill his assailants and himself. O'Leary reported that Colton's parents were "concerned for [Colton's] welfare" and took the gun to protect Colton. (Doc. 102-4 at 3.) According to Officer O'Leary's report, Juliena told Officer O'Leary that she would not be comfortable with Colton possessing the gun until Colton had received mental health treatment. Officer O'Leary advised Juliena on how to get Colton a mental health evaluation. Viewing the evidence in the light most favorable to Plaintiffs, it is reasonable to infer that Officer O'Leary knew that Peterson was potentially suicidal.

Sergeant Kosena telephoned Colton on July 25, 2010, after Colton called complaining that none of the suspects involved in the July 23rd incident had been arrested. Sergeant Kosena knew about the July 23rd incident prior to calling

Colton. Sergeant Kosena noted in his report that Colton's parents had taken

Colton's gun away because Colton had "threatened to kill the suspects and then

himself." (Doc. 102-1 at 6.) Sergeant Kosena's report also notes that Colton's

"parents are extremely concerned regarding Colton's mental health and believe[]

removing the pistol from him was necessary." *Id.* Sergeant Kosena noted that

Colton was "extremely upset." *Id.* Sergeant Kosena then sent an email to three

Missoula Police Department detective supervisors that reiterated this information.

Viewing the evidence in the light most favorable to the Plaintiffs, it is reasonable

to infer that Sergeant Kosena knew that Colton was potentially suicidal.

Detective Petersen received and read Sergeant Kosena's email on the

morning of July 26, 2010. Detective Petersen spoke with Colton on the phone that

same day. Colton told Detective Petersen that his parents took his gun because

they were afraid he was going to kill himself. Detective Petersen asked why

Colton would kill himself. Colton responded, "Why not?" *Id.* at 8. In addition,

on July 28, 2010, the day after Colton's suicide, Detective Petersen spoke on the

phone with a friend of Colton's, Brittany Arnott. The two discussed Colton's

suicide. In this conversation, Detective Petersen stated, "I think his parents were

concerned about the possibility of [Colton's suicide], um, I had concerns when I

spoke with him, uh, it wasn't yesterday but the day before, um, he made some

comments to me." (Doc. 102-9 at 2.) Viewing the evidence in the light most favorable to Plaintiffs, it is reasonable to infer that Detective Petersen knew that Colton was potentially suicidal.

Missoula County Sheriff's Detective Jon Gunter spoke with Juliena on July 26, 2010, while he and Detective Krueger executed the search warrant at Colton's apartment. Juliena repeatedly expressed her concern that Colton was suicidal. She told Detective Gunter about the July 23rd incident and Colton's statements that he was going to kill himself. Juliena told Detective Gunter that she had attempted to get Colton mental health treatment, but that she had been unsuccessful. Juliena testified that Detective Gunter told Juliena that he and Detective Krueger would get Colton a mental evaluation. Detective Gunter then spoke with Detective Krueger and expressed his concern that Colton may be suicidal. Detective Krueger suggested that getting Colton a mental evaluation may be the most appropriate course of action since Colton was potentially suicidal. Viewing the evidence in the light most favorable to Plaintiffs, it is reasonable to infer that Detective Gunter was aware that Colton was potentially suicidal.

Detective Krueger spoke with Detective Petersen several times on July 26, 2010, as he prepared his application for a search warrant. Detective Krueger was aware of Sergeant Kosena's memo regarding Colton. While executing the search

of Colton's apartment on the evening of July 26, 2010, Detective Gunter expressed to Detective Krueger his concern that Colton was potentially suicidal. During the interview at the police station, immediately after Detective Krueger obtained from Colton the names of two other drug dealers, Detective Krueger asked Colton if he was suicidal or thinking about harming himself. Following this, on the night of July 26, 2010, Juliena repeatedly expressed her concerns to Detective Krueger that Colton was suicidal. Juliena begged Detective Krueger to detain Colton and get Colton a mental evaluation. Viewing this evidence in the light most favorable to Plaintiffs, it is reasonable to infer that Detective Krueger knew that Colton was potentially suicidal.

Accordingly, Plaintiffs' objection regarding officer knowledge is sustained.

### C. Officer Notice

Plaintiffs third objection, that Judge Strong erred in determining that law enforcement officers lacked notice of Colton's suicide is generally duplicative of their second objection. Here, however, Plaintiffs contend that the officers "knew that Colton's suicide risk was heightened by his known use of marijuana." (Doc. 195 at 20.) This type of speculative inference would be insufficient by itself to defeat summary judgment, but it does not matter. In resolving Plaintiffs' second objection, the Court has already determined that the evidence viewed in the light

most favorable to Plaintiffs supports a reasonable inference that several officers were aware of Colton's risk of suicide. Most importantly, the Court has determined that the evidence supports a reasonable inference that Detective Krueger knew of Colton's risk of suicide. The Court does not need to rule on this objection.

### D. New Risk of Harm

Judge Strong found that Plaintiffs failed to present any evidence that any of the defendants acted to expose Colton to any new risk of harm. Plaintiffs object that Defendants exposed Colton to a new risk of harm in two ways. Plaintiffs contend that Detective Krueger's decision to utilize Colton to gather evidence for law enforcement against other drug dealers exposed Colton to increased emotional distress and psychological pressure, and ultimately increased his risk of suicide. Plaintiffs also contend that Krueger used bullying techniques during his meeting with Colton at Willard School to pressure Colton into providing additional information about other drug dealers.

While Defendants are correct that there is no evidence of any written or binding confidential informant agreement with Colton, the evidence demonstrates that Detective Krueger acted intentionally to pressure Colton to serve as a source of information for other drug dealers. Detective Krueger also suggested that

Colton could assist in setting up a controlled buy or sell with one of Missoula's bigger drug dealers. It is reasonable to infer that this pressure to provide information to police about other drug dealers exposed Colton to increased psychological stress and a greater risk of suicide.

Though the evidence regarding what occurred at Willard School is conflicting, if Plaintiffs' version of the interaction is believed, which it must be for purposes of summary judgment, then it is reasonable to infer that Detective Krueger acted at Willard School in a manner that significantly increased Colton's psychological stress and risk of suicide. Ms. Johns' testimony suggests that at Willard School Detective Krueger demanded that Colton provide him with the names of three more drug dealers or else face a life sentence in prison.[2] Ms. Johns testified that the interaction at Willard School had a dramatic and negative effect on Colton's state of mind, and that during the interaction Colton showed visible signs of increasing distress. Accordingly, the Court sustains Plaintiffs' fourth objection.

---

[2] The Court denies Detective Krueger's motion in limine (Doc. 141) with respect to Ms. Johns' testimony. Motions in limine are granted only when the evidence is inadmissible on all potential grounds. *BNSF Ry. v. Quad City Testing Laboratory, Inc.*, 2010 WL 4337827. The Court regards the statements made by Colton as likely admissible under exceptions to the hearsay rule, including Fed.R.Evid. 803(1), 803(2), and 803(3). Regardless, the statements are potentially non-hearsay. They may be offered without the intent to prove the truth of the matter asserted or to show the effect on the state of mind of the listener.

## II. Legal Objections

With the above established factual context in mind, the Court turns to Plaintiffs' legal objections and the parties' contentions regarding the merits of Plaintiffs' claims.[3]

### A. 42 U.S.C. § 1983 claim against Detective Krueger

Plaintiffs' 42 U.S.C. § 1983 claim alleges that Detective Krueger violated Colton's Fourteenth Amendment right to substantive due process by placing Colton in a known danger with deliberate indifference to his physical safety and life. In particular, Plaintiffs contend Detective Krueger violated Colton's substantive due process rights when, knowing Colton faced a particularized risk of suicide, Detective Krueger pressured, "manipulated," and "bullied" Colton to inform on drug dealers and set up controlled buys or sales with top drug dealers. (Doc. 195.) Plaintiffs contend Detective Krueger acted with deliberate indifference to the known danger of Colton's risk of suicide, and that this action foreseeably led to Colton's suicide. Plaintiffs object to Judge Strong's finding regarding deliberate indifference and his finding that Detective Krueger is entitled

---

[3] Plaintiffs have filed a motion to strike Defendants' reply briefs in support of their motions for summary judgment. In the alternative, Plaintiffs sought leave to file a surreply brief. Without striking Defendants' reply briefs, the Court grants Plaintiffs' motion to file a surreply brief.

to qualified immunity.

"The Due Process Clause of the Fourteenth Amendment provides that '[n]o State shall ... deprive any person of life, liberty, or property, without due process of law.' " *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 194 (1989). The Due Process Clause does not place an affirmative obligation on the state to protect the life, liberty, and property of individuals against private actors. *Id.* at 195.

While a state is generally not liable for its omissions, state officials may be liable for private harm under the due process clause where the state affirmatively places a person in danger. *Munger v. City of Glasgow Police Dept.*, 227 F.3d 1082, 1086 (9th Cir. 2000). To prevail under a state-created danger theory, a "plaintiff must demonstrate, at the very least, that the state acted affirmatively, and with deliberate indifference in creating a foreseeable danger to the plaintiff, leading to the deprivation of the plaintiff's constitutional rights." *Huffman v. County of Los Angeles*, 147 F.3d 1054, 1061 (9th Cir. 1998) (internal citations omitted). "Deliberate indifference is a stringent standard of fault requiring proof that a [state actor] disregarded a known or obvious consequence of his actions." *Bryan County v. Brown*, 520 U.S. 397, 410 (1997). The state actor must "recognize an unreasonable risk and actually intend to expose the plaintiff to such

risks without regard to the consequences to the plaintiff." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 975 (9th Cir. 2011). A court must determine whether any affirmative and deliberately indifferent act on the part of the state official "left the person in a situation that was more dangerous than the one in which they found him." *Munger*, 227 F.3d at 1086.

Plaintiffs contend Detective Krueger affirmatively placed Colton in greater danger of the known risk of suicide by coercing Colton into providing names and information about top drug dealers. Plaintiffs also contend Detective Krueger affirmatively placed Colton in greater danger of the known risk of suicide by "bullying" him about providing more names during the meeting at Willard school on July 27, 2010.

The Court concludes that a reasonable jury could find that Detective Krueger acted affirmatively in a manner that left Colton in a situation that was more dangerous than the one Krueger found him in. As established above, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that Colton's risk of suicide was known to Detective Krueger or so obvious to imply Krueger's knowledge.

Knowing that Colton was potentially suicidal, Detective Krueger acted affirmatively in deciding to utilize Colton as a source of information on top drug

28

dealers, and by suggesting that Colton could assist in setting up controlled buys or sales with top drug dealers. If Plaintiffs' version of events is believed, he also acted affirmatively by demanding Colton provide three names of top drug dealers to law enforcement by 5:00 p.m. on July 27, 2010. It is obvious that serving as a police informant against top drug dealers, and potentially assisting with controlled buys and sales would increase psychological stress in any person, and especially in a potentially suicidal person. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that Detective Krueger's actions aggravated Colton's known risk of suicide and made him more vulnerable to the danger he already faced. Crucially, it was because of Detective Krueger's position of authority as a state officer that he was able to exert this pressure on Colton, and in the face of Colton's known risk of suicide, Krueger used his position of authority to exert pressure on Colton. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1067 (9th Cir. 2006).

Whether this affirmative conduct constitutes deliberate indifference to Colton's risk of suicide also presents a genuine dispute of fact. At multiple and critical points during the investigation, Detective Krueger was warned that Colton was potentially suicidal, yet he always proceeded to press Colton for names and details about big drug dealers, knowing that Colton's informing on big drug

dealers was dangerous and psychologically stressful. The evidence supports an

inference that Detective Krueger viewed Colton as a small-time drug dealer who

could be best utilized by law enforcement as a source to get to the "top guys" in

the illegal drug trade. (Doc. 93-13 at 51.) Importantly, Detective Krueger also

continued to press Colton to provide information immediately after his

conversation with Juliena. In this conversation, Juliena allegedly begged Detective

Krueger to detain Colton and get him a mental evaluation because of Colton's risk

of suicide. Detective Krueger clearly recognized that Colton's informing on drug

dealers was dangerous, as evidenced by the fact that he warned Colton not to talk

to his friends or family and to pretend that he had outsmarted the cops, because

Colton did not "want that to get back to these people." (Doc. 93-13 at 66.) Based

on the testimony of Ms. Johns, at Willard School Detective Krueger continued to

press Colton despite obvious signs of Colton's significant emotional distress. The

fact that Colton committed suicide within two hours of the final meeting with

Detective Krueger supports an inference that Detective Krueger's actions on July

27, 2010, significantly increased Colton's psychological stress and risk of suicide

and constituted deliberate indifference.

Plaintiff has presented sufficient evidence for a reasonable jury to conclude

that Detective Krueger acted with deliberate indifference to Colton's risk of

suicide, and that this conduct left Colton in a more dangerous situation than the one in which Krueger found him. Accordingly, the Court concludes that viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have established that Detective Krueger's actions violated Colton's 14th Amendment right to substantive due process.

### 2. Qualified Immunity

In order to overcome a claim for qualified immunity, a plaintiff must establish both a constitutional violation and that the right violated was "clearly established." *Saucier v. Katz* 533 U.S. 194, 201 (2001). A right is considered clearly established when its "contours" are sufficiently clear to put an officer on notice that his conduct is unlawful. *Id.* at 206. Finding that a right is clearly established, however, does not require "a prior case with identical, or even materially similar facts." *Kennedy*, 439 F.3d at 1065.

In the Ninth Circuit, "the law [is] clearly established that officers may be liable where they affirmatively place an individual in danger." *Munger*, 227 F.3d at 1086; *Kennedy,* 439 F.3d at 1066 ("It is beyond dispute that in September 1998, it was clearly established that state officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger she would not otherwise have faced.").

In their objections under the heading "Qualified Immunity," Plaintiffs argue for a "reckless indifference" standard rather than a "shocks the conscience" standard because Krueger had ample opportunity to deliberate upon his alternatives prior to acting. The objection is largely immaterial to the Court's resolution of the qualified immunity inquiry. In any event, though Plaintiffs cites *Tennison v. City & Co. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009), to support their contention that a reckless indifference standard applies, that case is readily distinguishable as it involved *Brady* evidence withholding issues, not a deliberate indifference state-created danger scenario. Ninth Circuit case law makes clear that in a state-created danger case, the mental state required is deliberate indifference "no more, no less." *Kennedy*, 439 F.3d at 1064. This is "because the use of such subjective epithets as 'gross,' 'reckless,' and 'shocking' sheds more heat than light on the thought process courts must undertake in cases of this kind." *Id.* (quoting *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)). Accordingly, Plaintiffs objection that the required mental state is reckless indifference, rather than deliberate indifference is overruled.

Plaintiffs contend Detective Krueger is not entitled to qualified immunity because Colton was in custody when Detective Krueger first pressured Colton about providing information to the police on other drug dealers. Plaintiffs thus

contend the special relationship exception to the general rule that a state is not liable for its omissions applies. This contention is without merit. "The special-relationship exception does not apply when a state fails to protect a person who is not in custody." *Patel.*, 648 F.3d at 972. The special relationship exception based on custody is inapplicable here because it is undisputed that Colton was not in custody at the time he committed suicide. Accordingly, Plaintiffs objection in this regard is overruled.

Ultimately, the Court concludes that Detective Krueger is not entitled to qualified immunity. As explained above, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that Detective Krueger acted affirmatively and with deliberate indifference and left Colton in greater danger of his known risk of suicide. In the Ninth Circuit, it is clearly established that state officials may be held liable where they affirmatively and with deliberate indifference place an individual in danger he would not otherwise have faced. *Munger*, 227 F.3d at 1086; *Kennedy,* 439 F.3d at 1066; *Patel*, 648 F.3d at 975; *Huffman*, 147 F.3d at 1061. Though there is no case in the Ninth Circuit specifically on point,[4] the contours of the law were sufficiently clear that Detective

---

[4] But see *Armijo v. Wagon Mount Public* Schools, 159 F.3d 1253 (10th Cir. 1998); and *Sloane v. Kanawha County Sheriff Dept.*, 342 F.Supp.2d 545 (S.D. W. Va. 2004).

Krueger may be said to have been on notice that his conduct was unlawful. Accordingly, the Court concludes that Defendant Krueger is not entitled to qualified immunity.

## C. Montana State Law Claims

Judge Strong recommended that Plaintiffs' state law claims be dismissed; or, if this Court disagrees, to remand those claims to state court. For the reasons explained, Plaintiffs' state law negligence and constitutional claims are dismissed. Plaintiffs' emotional distress claims survive.

### 1. Negligence claim

Judge Strong found that Montana's public duty doctrine bars Plaintiffs' negligence claims. He found that none of the exceptions to the public duty doctrine apply. Plaintiffs contend the special relationship exception to the public duty doctrine applies because Krueger created a special relationship with Colton by pressuring him to work as an informant.

"The public duty doctrine provides that a governmental entity cannot be held liable for an individual plaintiff's injury resulting from a governmental officer's breach of a duty owed to the general public rather than to the individual plaintiff." *Massee v. Thompson*, 90 P.3d 394, 403 (Mont. 2004). An exception to the public duty doctrine exists when a special relationship giving rise to a special

34

duty is established between an individual and a government agent. The following specific exceptions have been identified by the Montana Supreme Court: "1) [when] a statute [exists] intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; 2) when a government agent undertakes specific action to protect a person or property; 3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and 4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff." *Id.*

Plaintiffs cite *Gatlin-Johnson ex rel. Gatlin v. City of Miles City*, 291 P.3d 1129 (Mont. 2012)("*Gatlin*") as support for their position that a special relationship existed between Detective Krueger and Colton. Plaintiffs contend that public duty doctrine analysis is not controlled by "a mechanical application of an immutable list of talismans." (Doc. 195 at 54.) Acknowledging the four recognized exceptions to the public duty doctrine, Plaintiffs argue for a new kind of exception to the public duty doctrine: an exception based on the foreseeability of the harm to the plaintiff.

Neither *Gatlin* nor any other Montana case supports this kind of broad, generalized exception to the public duty doctrine based on foreseeability. In cases where the public duty doctrine applies, the Montana Supreme Court has only

35

allowed a negligence action against a governmental officer to go forward when the plaintiff demonstrates that one of the four recognized exceptions to the doctrine applies. *See e.g. Orr v.* State, 106 P.3d 100 (Mont. 2004)(statute exception); *Nelson v. Driscoll,* 983 P.2d 972 (Mont. 1999) (officer assumed duty to protect); *Gonzalez v. City of Bozeman,* 217 P.3d 487 (Mont. 2009) (addressing custody exception, rejecting its application and applying public duty doctrine). *Gatlin* simply affirms that "the public duty doctrine was not intended to apply in every case to the exclusion of any other duty a public entity may have." *Gatlin,* 291 P.3d at 1133. *Gatlin* did not create a new, generalized "foreseeability" exception to the public duty doctrine.

In discussing the doctrine, *Gatlin* describes with approval the four recognized exceptions. *Id.* at 1132-1133. And ultimately, *Gatlin* makes clear that the public duty doctrine applies to this case. *Gatlin* holds that the doctrine "applies only if the entity truly has a duty owed only to the public at large, such as a duty to provide law enforcement services." *Id.* at 1133. Here, the duty involved is the duty to provide law enforcement services.

Neither does *Nelson* support Plaintiffs' contention. In *Nelson,* the Court determined that the officer, through affirmative steps, undertook to protect the plaintiff. *Nelson,* 983 P.2d at 981. Here, Plaintiffs' central contention is that

36

Detective Krueger deliberately acted in a manner *contrary* to Colton's safety and well-being. Plaintiffs fail to create a genuine dispute that Detective Krueger undertook to protect Colton.

Finally, the public duty doctrine does not violate Montana statutes or the Montana Constitution as argued by Plaintiffs. The public duty doctrine is a common law doctrine "which expresses the policy that a police officer's duty to protect and preserve the peace is owed to the public at large and not to individual members of the public." *Nelson v. Driscoll*, 983 P.2d 972, 978 (Mont. 1999). The Montana Supreme Court has found that the doctrine "serves the important purpose of preventing excessive court intervention into the governmental process by protecting the exercise of law enforcement discretion." *Id.* (citing *Ezell v. Cockrell*, 902 S.W.2d 394, 397 (Tenn. 1995)). Montana law governs Plaintiffs' Montana state law claims. Plaintiffs' citations to Montana's maxims of jurisprudence, generalized snippets from the Montana Constitution, and a law review article do not demonstrate that the well-established public duty doctrine is unconstitutional or contrary to Montana statutes. The public duty doctrine was properly applied to this case, and it bars Plaintiffs' negligence claims.

Judge Strong correctly found that none of the exceptions to the public duty doctrine apply to the facts of this case, and the doctrine therefore bars Plaintiffs'

37

negligence claims. Plaintiffs' objection consequently fails and Defendants are entitled to summary judgment on the state law negligence claims.

### 2. Montana Constitutional Claims

The public duty doctrine also bars Plaintiffs' Montana constitutional claims. Plaintiffs' reliance on *Dorwart v. Caraway*, 58 P.3d 128 (Mont. 2002) is misplaced because *Dorwart* involved procedural due process instead of the nebulous and undefined area of substantive due process, and it did not address application of the public duty doctrine. Plaintiffs again cite to no authority holding that the doctrine only applies to negligence claims, and this Court agrees with Judge Strong that such a limited view is not appropriate. Defendants are entitled to summary judgment on the Montana constitutional claims.

### 3. Emotional Distress Claims

Plaintiffs have waived William Darling's emotional distress claim, but maintain that of Juliena Darling. Judge Strong found that Plaintiffs failed to provide any expert testimony supporting Juliena Darling's emotional distress claim, and even if they had, the facts "though difficult, fall short of the threshold emotional distress so severe that no reasonable person could be expected to endure it." (Doc. 189 at 8.)

Plaintiffs contend that Juliena Darling's treating psychologist, Dr.

Bornstein, diagnosed her with PTSD, an ailment from which she has suffered since her son's death. Dr. Bornstein's summary report, dated July 31, 2013, reveals that he began treating Juliena Darling in December 2012 and states that "Ms. Darling clearly suffers from PTSD." (Doc. 102-32 at 3.) The City and County Defendants argue that this evidence does not show that Juliena Darling's emotional distress meets the high severity standard, and that Judge Strong's determination is correct.[5]

Emotional distress claims are compensable in Montana "only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity." *Renville v. Fredrickson*, 101 P.3d 773, 776 (Mont. 2004).[6] A "physical manifestation of bodily harm resulting from emotional distress, such as PTSD, is sufficient evidence that the plaintiff's emotional distress is genuine and severe." *Feller v. First Interstate Bancsystem, Inc.*, 299 P.3d 338,

---

[5] The state law emotional distress claims are made against the municipalities because Detective Krueger is indisputably immune from suit for this claim pursuant to Montana Code Annotated § 2-9-305(5). Thus, it is the governmental entities who are potentially liable for Detective Krueger's actions. *See Kenyon v. Stillwater County*, 835 P.2d 742, 745 (1992).

[6] In Montana, both negligent and intentional infliction of emotional distress claims are predicated on the same standard of culpable conduct: emotional distress must be "the reasonably foreseeable consequence of the defendant's act or omission." *Sacco v. High Country Indep. Press*, 896 P.2d 411, 428 (Mont. 1995).

345 (Mont. 2013) (quoting *Henricksen v. Mont.*, 84 P.3d 38, 55 (Mont. 2004). "It is for the court to determine whether on the evidence severe [serious] emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed." *Sacco v. High Country Independent Press, Inc.*, 896 P.2d 411, 425 (Mont. 1995).

Juliena began seeing Dr. Philip H. Bornstein, a licensed clinical psychologist, in December 2012, following Colton's suicide on July 27, 2012. Since December 2012, Juliena has met with Dr. Bornstein on a weekly or bi-weekly basis for psychological treatment. Dr. Bornstein opines that Juliena "clearly suffers from PTSD." (Doc. 102-32 at 3.) Dr. Bornstein characterizes Juliena's PTSD as "debilitating" and "pervasive." *Id.* The Court concludes that Plaintiffs have presented sufficient evidence to allow Juliena's emotional distress claim to go forward. Plaintiffs' objections regarding Juliena's emotional distress claim is sustained. Defendant City of Missoula's motion for summary judgment on Plaintiffs' emotional distress claim is therefore denied.

However, Plaintiffs' emotional distress claim fails against the County of Missoula because Detective Krueger was not an agent of the County, even as a Task Force Officer. The Court rejects Plaintiffs joint venture argument with respect to the task force. Plaintiffs cite no cases making all participating agencies

40

in a crime task force jointly and severally liable. Defendant County of Missoula's motion for summary judgment on the emotional distress claims is granted.

**D.    Michael Levine**

Judge Strong recommended precluding all testimony of Plaintiffs' expert on police practices, Michael Levine. Judge Strong found Mr. Levine's expert report was untimely and that the report expresses inadmissible testimony beyond any demonstrated expertise of Mr. Levine. For the reasons explained, the Court will not entirely preclude Mr. Levine from testifying.

Plaintiffs contend the report was timely disclosed on August 2, 2013, in accordance with the Court's scheduling Order. Plaintiffs further contend that they intend to introduce only evidence that was disclosed in the August 2, 2013 expert report. Finally, Plaintiffs contend that the opinions offered in the redacted report are admissible.

Though both Detective Krueger and the City of Missoula timely filed objections to the sufficiency of Mr. Levine's report, asserting substantive deficiencies, a close review of those objections reveals that neither party objected to the timeliness of the expert report. To the extent Defendants now contend that the report was untimely, this objection is waived. (Doc. 33 at 7.) Accordingly, the Court sustains Plaintiffs' objection to Judge Strong's finding that Mr. Levine

should be precluded from testifying because his report was untimely.

As to Defendants' substantive objections, the Court will defer ruling on specific objections until the time of trial. Mr. Levine will be allowed to offer some of the opinions contained in the redacted expert report. These opinions were all offered before the August 2, 2013 deadline for expert disclosures. Moreover, in the main, these opinions are admissible under Rule 702 of the Federal Rules of Evidence.

The Court offers the following general guidance to the parties with respect to Mr. Levine's testimony based on its review of the redacted report. Mr. Levine is unqualified to offer opinion evidence as to the cause of Colton's suicide. Mr. Levine may not offer testimony that speaks to the credibility of other witnesses, implies knowledge of what certain witnesses knew or didn't know at certain times, or implies knowledge of Colton's mental health. Mr. Levine will not be allowed to testify that certain conduct on the part of the officers violated the law. To allow such testimony would invade the province of the jury. Mr. Levine has no direct knowledge of these things and is not qualified to offer opinions on them.

Mr. Levine may offer opinion testimony regarding law enforcement tactics and training as it relates to this case. Mr. Levine has expertise in these areas, and many of his opinions are sufficiently reliable so as to meet the threshold

established by Rule 702. The Court will not entirely exclude Mr. Levine from testifying "merely because [his opinions] are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,738 F.3d 960, 969 (9th Cir. 2013); *Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014).

### E. § 1983 *Monell* claims and claims against McMeekin and Muir

Judge Strong did not specifically rule on Defendants' motions for summary judgment on Plaintiffs' *Monell* claims or the claims against McMeekin and Muir. The Court concludes Defendants are entitled to summary judgment on these claims.

### 1. Individual Liability for Sheriff McMeekin and Chief Muir

Plaintiffs' claims, against the city and county, and against Sheriff McMeekin and Chief of Police Muir, are based on a failure to train and supervise Detective Krueger. Plaintiffs do not allege that either Sheriff McMeekin or Chief Muir were ever present at the scene of any of the alleged constitutional violations. Plaintiffs likewise offer no evidence that either supervisor specifically ratified Detective Krueger's conduct. Instead, Plaintiffs focus on alleged lack of training Detective Krueger received as it relates to the handling of confidential informants and risk of suicide.

"Each government official, his or her title notwithstanding, is only liable for

43

his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009).

"Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009).

"An individual supervisory defendant can be liable for his or her failure to train subordinates when in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the [supervisor] ... can reasonably be said to have been deliberately indifferent to the need." *Peschel v. City of Missoula*, 686 F.Supp.2d 1092, 1101 (D. Mont. 2009) (citing *Clement v. Gomez*, 298 898, 905 (9th Cir. 2002)). The failure to train must represent a deliberate or conscious choice to follow a course of action from among various alternatives. *Id.*

A plaintiff must also demonstrate a causal connection between the supervisor's acts and the alleged constitutional violation. *Id.* Plaintiffs must show that the constitutional violation resulted from the failure to properly train or that

44

the failure to train "set[] in motion a 'series of acts by others which the [supervisor] knows or reasonably should know would cause other to inflict constitutional harms." *Corales*, 567 F.3d at 570.

Here, Plaintiffs do not allege or provide evidence that either supervisor was ever present at any point during the investigation related to Colton. Nor do Plaintiffs point to any other instances where other members of the Drug Task Force violated the constitutional rights of other confidential informants or drug suspects. Plaintiffs thus do not forward a valid acquiescence or ratification theory on which to impose supervisory liability. *See Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011); *Hydrick v. Hunter*, 669 F.3d 937 (9th Cir. 2012). Instead, Plaintiffs focus exclusively on deficiencies in Detective Krueger's training as it relates to the use of confidential informants and the handling of potentially suicidal suspects or individuals.

Plaintiffs' claim of supervisory liability against Sheriff McMeekin fails. As noted above, Plaintiffs have voluntarily dismissed all claims against Missoula County Deputy Sheriff Jon Gunter. Under the drug task force policies in place in July 2010, Sheriff McMeekin was responsible only for training and supervising those task force officers from his agency who participated in the Drug Task Force. Thus, Sheriff McMeekin had no responsibility to train and supervise Detective

Krueger, despite the County's participation in the Drug Task Force. Detective Krueger's training and supervision was left to City of Missoula officials. Given this, and the fact that Plaintiffs do not point to any other instances of subordinate misconduct, Plaintiffs fail to create any genuine dispute of fact that Sheriff McMeekin was deliberately indifferent to the need for more or better training for Detective Krueger or other City of Missoula police officers on the drug task force. Plaintiffs fail to create a genuine dispute of fact that Sheriff McMeekin knew that Detective Krueger needed additional training from anyone, especially not from Sheriff McMeekin. Plaintiffs also present no evidence that Sheriff McMeekin acquiesced in the deprivation of Colton's constitutional rights. Plaintiffs fail to provide sufficient evidence of culpable conduct or the requisite causal connection between Sheriff McMeekin's action or inaction and the constitutional harm allegedly inflicted by Detective Krueger. Accordingly, Sheriff McMeekin is entitled to summary judgment on the § 1983 claim.

Plaintiffs § 1983 claim against Chief Muir similarly fails. Though Chief Muir was responsible for Detective Krueger's training and supervision, Plaintiffs fail to present sufficient evidence to create a genuine dispute that the need for more training in the handling of confidential informants or suicidal drug suspects was obvious. Though a Plaintiff need not always point to evidence of other

constitutional violations in order to demonstrate a need for more training, the need

for more training in such cases must be "patently obvious." *Connick v. Thompson*,

131 S.Ct. 1350, 1361 (2011). Here, Defendants present evidence that Detective

Krueger received a great deal of training, though perhaps only limited training in

the specific areas of evaluating individuals for suicide risk and the use of

confidential informants. Detective Krueger attended a DEA basic drug

investigator training course. The Missoula Police Department also had established

a process for how to sign up confidential informants. In addition, all City of

Missoula police officers receive brief ongoing training daily, must meet or exceed

minimum standards for hiring, must meet the employment education and

certification standards, and are required to complete the basic academy at the

Montana Law Enforcement Academy or that of another state. Also, Missoula City

Police Officers must complete a variety of other training courses before they can

work on their own. The Missoula Police Department has received national

recognition for its training program for new officers.

Plaintiffs point to deficiencies related to specific HIDTA training,[7] but do

not dispute that Detective Krueger received all of the training required by the

_____

[7] In this respect, the Court has considered Plaintiffs' supplemental statement of disputed facts and grants Plaintiffs' motion for leave to file a supplemental statement of facts.

Missoula Police Department and the DEA course for drug investigators.

Additionally, Plaintiffs' expert, Michael Levine, opines that "training in the area

of Informant-handling and reporting related thereto, was willfully and recklessly

deficient." (Doc. 183-1 at 20.) However, Mr. Levine's opinion regarding training

is merely a "tentative opinion[]" because at the time he formed the opinion he "did

not really have time to fully concentrate on" the subject of training or managerial

responsibility. (Doc. 112-1 at 26.) Worse, Mr. Levine fails to identify any

specific training deficiencies or identify any better training programs that have

been employed elsewhere by other municipal police departments that, if utilized,

would have avoided the constitutional violation.

Under these circumstances, the Court does not regard the need for

additional, specific training regarding the use of confidential informants and

suicidal suspects to fall in the "narrow range of circumstances" where the need for

more training is "so patently obvious" that a claim can be maintained without

demonstrating a pattern of or any other similar violations.  *Connick*, 131 S.Ct. at

1361.  In addition, Plaintiffs fail to address Chief Muir's claim for qualified

immunity.  Notably, Plaintiffs do not cite any case where a failure to train claim

against a supervisor has succeeded despite a plaintiff's failure to demonstrate

another instance or pattern of similar violations.  The Court thus concludes that

Plaintiffs fail to create any genuine dispute of fact that Chief Muir was deliberately indifferent to an obvious need for more or better training. Accordingly, Chief Muir is entitled to summary judgment.

### 2. *Monell* Claims

Though courts distinguish between the supervisory and municipal liability under § 1983, here Plaintiffs have generally conflated their supervisory and municipal liability claims. Nonetheless, the Court provides a separate analysis of Plaintiffs' *Monell* claim against the County of Missoula.

"[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)(emphasis in original). A plaintiff must establish "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.*

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. A failure to properly train will represent a policy for which a city is responsible when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the

violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. A failure to train must represent a deliberate or conscious choice among various alternatives presented to the municipal policymaker. *Id.* at 389.

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 131 S.Ct. at 1360. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 1359.

For many of the same reasons that Plaintiffs' claims against the individual supervisory officials fail, Plaintiffs' *Monell* claims also fail. Plaintiffs' fail to create any genuine issue of fact that the need for more training or supervision in the area of confidential informant handling and suicidal suspects was obvious. Plaintiffs present no evidence of similar violations or a pattern of unconstitutional conduct on the part of either the Sheriff's Department or the Missoula Police Department. Accordingly, Missoula County and the City of Missoula are entitled to summary judgment on Plaintiffs' § 1983 claims.

IT IS ORDERED that the findings and recommendations (Doc. 189) are ADOPTED IN PART and REJECTED IN PART.

IT IS FURTHER ORDERED that:

1.  Defendant Krueger's motion for summary judgment (Doc. 84) is GRANTED IN PART AND DENIED IN PART.

2.  Defendants County of Missoula and Sheriff McMeekin's motion for summary judgment (Doc. 86) is GRANTED.

3.  Defendants City of Missoula and Chief Muir's motion for summary judgment on all federal claims (Doc. 87) is GRANTED.

4.  Defendants City of Missoula and Chief Muir's motion for summary judgment on all state law claims (Doc. 90) is GRANTED IN PART AND DENIED IN PART.  Plaintiffs' emotional distress claims against the City survive and all other state law claims are dismissed.

5.  Plaintiffs' motion for leave to file supplemental statement of facts (Doc. 118) is GRANTED.

6.  Plaintiffs motion to strike or for leave to file a surreply (Doc. 130) is GRANTED IN PART AND DENIED IN PART.

7.  Defendant Krueger's motion in limine (Doc. 141) is DENIED.

8.  Defendants City of Missoula and Mark Muir's Motion in Limine and for Sanctions Concerning Michael Levine's Reports, Testimony, and Opinions (Docs. 111, 127) is DENIED. The Court will rule on

specific objections at the time of trial.

The Court will rule on the remaining pending motions by separate order.

DATED this **6**th day of August 2014.

Dana L. Christensen, Chief Judge
United States District Court